IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:02CR238 |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| DONALD H. ASAY, | ) | |
| TERRY J. SAMOWITZ, | ) | |
| GREGORY W. ENGER and | ) | |
| DONALD A. HEIDEN, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the defendants' motion to dismiss (Filing No. 255) and motion to strike (Filing No. 261). In the motion to dismiss, the defendants contend the Superseding Indictment (Filing No. 240) should be dismissed for because it fails to satisfy the materiality and intent requirements of the mail and wire fraud statutes. The defendants filed a brief (Filing No. 256), an index of evidence (Filing No. 270) and a reply brief (Filing No. 286) in support of their motion. The government filed a brief (Filing No. 281) in opposition to the motion to dismiss. In the motion to strike, the defendants seek to strike the "further factual findings" contained in the Superseding Indictment. The defendants filed a brief (Filing No. 262) in support of their motion. The government filed a brief (Filing No. 280) in opposition to the motion to strike. The undersigned magistrate judge recommends that both motions be denied.

The court heard evidence and additional argument related to the motion on March 1-2, 2005. The transcript (TR.) of the hearing was filed on March 10, 2005. **See** Filing No. 301.[1] During the hearing Special Agent Laura J. Stewart (Special Agent Stewart) and Professor Joseph P. Bauer (Professor Bauer) testified. The court received into evidence Exhibits 1-18 from the government and Exhibits 100-119 from the defendants. **See** Filing No. 293.

---

[1]The transcript was originally filed on March 10, 2005, as Filing No. 295, however corrected transcripts were filed on June 10, 2005, as Filing No. 298, and June 18, 2005, as Filing No. 301. The court will refer to the latest filed transcript in this order.

**BACKGROUND**

The defendants are charged in an eighteen-count indictment with mail fraud in violation of 18 U.S.C. §§ 1341 and 2 (Counts 1-15); wire fraud in violation of 18 U.S.C. §§ 1343 and 2 (Count 16); conspiracy to launder money in violation of 18 U.S.C. §§ 1956(h) and 2 (Count 17); and criminal forfeiture under 18 U.S.C. § 982 (Count 18). **See** Filing No. 240. The charges are based upon allegations the defendants fraudulently represented they were buying for closed-door pharmacies, to purchase pharmaceuticals at a discounted rate, with the intent to illegally divert pharmaceuticals to a wholesale market for higher profit. A closed-door pharmacy is one which typically purchases pharmaceuticals at a discounted rate, below wholesale rates, and dispenses to institutional clients such as hospital, prison or nursing home patients, rather than to retail locations. **See** *id.* ¶¶ 3-4. The closed-door pharmacies only receive the discounted rate if they certify, with an "own-use" certification, that the pharmaceuticals are purchased for its own-use or will be dispensed only to patients in its institutional locations. **See** *id.* ¶ 4. The closed-door pharmacies often join buying groups whose business it is to negotiate contract prices with the pharmaceutical manufacturers. **See** *id.* ¶ 5.

**ANALYSIS**

**A.  Motion to Dismiss**

The defendants contend the superceding indictment should be dismissed because the mail and wire fraud counts are impermissibly based on the breach of ambiguous contract terms. Further, the defendants contend that because the contract terms are ambiguous the Rule of Lenity should be applied preventing criminal charges and that the government cannot satisfy the materiality and intent requirements of the mail and wire fraud statutes (18 U.S.C. §§ 1341 and 1343). Specifically, the defendants rely on the "own use" certification language contained in the COHR Inc./Purchase Connection Participation Agreement for closed door pharmacies. Purchase Connection Agreement provides: "Whereby the Participating Member desires to enter into this Agreement for the purpose of participating in COHR-Inc. negotiate group purchasing agreements involving the

purchase of health care supplies and equipment solely for its "own use."  **See** Exhibit 113, p. 1.  The agreement further states:

> The Participating Member expressly and unequivocally understands and agrees the <u>each and every</u> purchase made through any COHR-Inc. negotiated group purchasing agreements for health care supplies and equipment are for that Participating Members' ultimate consumption or "own use."  "Own use" being defined by any of the following:
> A) Those relevant sections of the Prescription Drug Marketing Act of 1987 and any amendments thereto, and/or
> B) Those relevant sections of the Robinson-Patman Act of 1932 and any amendments thereto, and/or
> C) The Supreme Court's decision in <u>Abbott Laboratories et al. v. Portland Retail Druggist Association, Inc., Etc.</u> (1976) 425 U.S. 1.
> **THIS AGREEMENT SHOULD NOT BE ENTERED INTO IF THE PARTICIPATING MEMBER IS NOT ABSOLUTELY CLEAR AS TO WHAT IS MEANT BY "OWN USE" AS IT RELATES TO PRODUCT PURCHASED PURSUANT TO THIS AGREEMENT.**

**See** Purchase Connection Participation Agreement, Exhibit 113, p. 3 (Landmark Pharmacy unsigned, first page dated July 28, 1997); and Exhibit 119 (Ovation Pharmacy signed March 5, 1997).

The defendants argue the definitions of "own use" provided in the Purchase Connection agreement are inapplicable to the transactions identified in the indictment because none of the three possible definitions apply to for-profit pharmacies.  Professor Bauer's testimony by report and during the hearing focuses on how the three definitions cannot apply to the defendants' pharmacies.  Additionally, the defendants contend Purchase Connection knew the defendants had for-profit pharmacies and therefore did not expect the defendants' pharmacies to comply with the "own use" portion of the agreement.

The defendants, however, do not address the similar "own use" certification addressed to "Dear Vendor."  Exhibit 113, p. 8.  Or the other evidence presented by the government showing additional certifications based upon different certification language.

3

For example, on December 30, 1996, Enger entered into a group purchasing agreement with PharmaCare Dynamic Management Corporation (PDM). The agreement provides:

> The member agrees that all pharmaceuticals and related products, medical/surgical, dietary, and laboratory products purchased pursuant to this Agreement shall be used in accordance with applicable federal, state and local laws and with such restrictions as imposed by the Vendors (additionally see Exhibit A for Managed Care Institutions).

**See** Exhibit 1.

The heading of the attached Exhibit A reads "Managed Care Institution 'Own Use' Certification", which states:

> Ovation Pharmacy Consultants, Inc. certifies that it is a "***closed door***" facility serving only its employees and/or patients. Any pharmaceuticals or other related products purchased by this institution though PDM's negotiated special priced contracts from various manufacturers/vendors are for the institutions' own use in the care of its employees and/or patients only, and not for resale to "walk-in" patients. Usage shall comply in full with and as defined in the ***Abbott Laboratories et al. vs. Portland Retail Druggist Association, Inc.***, 425 U.S. 1 (1976).

*Id.* p. 3 (the document also defines managed care institution by listing five types of facilities). The PDM Member Data Sheet for Ovation Pharmacy lists "Long term care 150 beds" as its class of trade. *Id.* p. 4 (although an option, "retail pharmacy" is not marked).

Similarly, in a contract eligibility questionnaire and certification form for Knoll Pharmaceutical Company (Knoll), Ovation Pharmacy certified it was a "Nursing Home Provider (Closed Door/No Retail)" with 150 beds and had a ten percent Medicaid client base. **See** Exhibit 2 (The questionnaire provided questions to clarify where the applicant was a combination retail and closed door facility, about which Ovation Pharmacy stated the questions were not applicable.). The certification from Ovation Pharmacy and required by Knoll states:

> The following HSCA Member Facility certifies that it is operating either:
> (i)  as the exclusive provider of said products to customers of Facility;

4

>> (ii) as a nonprofit institution, eligible for all purposes under the Non-Profit Institutions Act, 15 U.S.C. § 13c, for which purchases are made for Facility's "own use"; or
>> (iii) as a for profit organization, for which purchases are made for Facility's "own use" as defined in <u>De Modena, et al v. Kaiser Foundation Health Plan, Inc. et al</u> 743 F.2d 13888 [sic] (9 Cir. 1984), applying the holding of the U.S. Supreme Court in <u>Abbott Laboratories, et al v. Portland Retail Druggist Association, Inc.</u>, 425 U.S. 1 (1976).

**See** Exhibit 2, p. 9 (signed in August 1997). Similar exclusive use certifications were signed on behalf of the defendants' pharmacies for pharmaceutical manufacturers and/or buying groups. **See** Exhibit Nos. 9-18.

The ***De Modena*** court defined "own use" based on the definition used in ***Abbott Labs***. ***De Modena v. Kaiser Found. Health Plan, Inc.***, 743 F.2d 1388, 1393 (9th Cir. 1984) (**citing *Abbott Labs. v. Portland Retail Druggists Ass'n***, 425 U.S. 1, 11 (1976)). ***Abbott Labs.*** created a test to determine whether certain drugs sales were for the buyer's own use. Under this test, "'their own use' is what reasonably may be regarded as use by the hospital in the sense that such use is a part of and promotes the hospital's intended institutional operation in the care of persons who are its patients." ***Abbott Labs.***, 425 U.S. at 14. However, the ***De Modena*** court went on to examine which drug sales of the buyer were consistent with the basic institutional function of the buyer and required separation of those sales to "members" from the sales to "nonmembers." ***De Modena***, 743 F.2d at 1393. As the defendants note, the relevant party in ***Abbott Labs*** was a non-profit organization. So too are the relevant parties in ***De Modena***. However, the Knoll certification explicitly applies the ***Abbott Labs./De Modena*** definition of "own use" to for-profit organizations. Similarly, the same reference to the ***Abbott Labs.*** definition used in the Purchase Connection may be applied to for-profit organizations.

Accordingly, since the contract terms are not ambiguous, the defendants' contention that the superceding indictment should be dismissed because the mail and wire fraud counts are impermissibly based on the breach of ambiguous contract terms must fail. In the alternative, the government does not rely solely on the Purchase Connection agreement, but on "own use" certifications made by the defendants in other documents

5

and other evidence to show materiality and intent. Therefore, the defendants' related arguments must also fail.

Finally, although pharmaceutical sellers often grant discounts to institutional customers without regard to whether they are non-profit or for-profit purchasers, ***United States v. Costanzo***, 4 F.3d 658 (8th Cir. 1993), whether the purchaser makes purchases for its own-use may be relevant to price determinations without regard to either the Robinson-Patman Act or the Non-Profit Institutions Act. ***United States v. Ferro***, 252 F.3d 964, 967 (8th Cir. 2001). "This further suggests that, even when dealing with a for-profit institutional customer, a seller may wish to know, for Robinson-Patman Act compliance purposes, whether the customer is purchasing for its 'own use.' In these circumstances, the materiality of an 'own use' misrepresentation may not be determined as a matter of law." ***Id.*** at 967-68 ("materiality is an issue for the jury . . . so long as the indictment contains a facially sufficient allegation of materiality"). For these reasons, the undersigned magistrate judge will recommend the defendants' motion to dismiss be denied.

### B.   Motion to Strike

In the motion to strike, the defendants seek to strike the "further factual findings" contained in the Superseding Indictment. Specifically, the defendants seek to strike the following language:

1. (a)  The defendants, DONALD H. ASAY and TERRI J. SAMOWITZ, were organizers or leaders of the criminal activity that involved five or more participants or was otherwise extensive.
   (b)  The defendants, GREGORY W. ENGER and DONALD A. HEIDEN were managers or supervisors (but not organizers or leaders) in a criminal activity [that] involved five or more participants or was otherwise extensive.
   Or in the alternative to either or both of the subparagraph (a) and/or (b) above;
   (c)  the defendants, DONALD H. ASAY, TERRI J. SAMOWITZ, GREGORY W. ENGER, and DONALD A. HEIDEN were organizers, leaders, managers, or supervisors in a criminal activity other than as described in (a) or (b) above.
2. The total approximate proceeds received by defendants, DONALD H. ASAY, TERRI J. SAMOWITZ, DONALD A. HEIDEN, and GREGORY W. ENGER, from the activities alleged in this Superseding Indictment are an amount between $2,500,000.00 and $5,000,000.00.

**See** Filing No. 240, p. 19.

The defendants also seek to strike the following language:

10.  . . . DONALD H. ASAY, his daughter TERRI J. SAMOWITZ, as well as DONALD A. HEIDEN and GREGORY W. ENGER, were previously involved in or were all associates with another party involved in obtaining pharmaceutical products by false representations.

*Id.* p. 3 (added to motion during hearing at TR. 248-250).

The defendants challenge the indictment, contending that inclusion of the "Further Factual Findings" allegations in the indictment is improper because the allegations do not constitute criminal conduct defined by Congress. The defendants argue the further factual finding and the last sentence in paragraph 10 are surplusage that do not constitute criminal offenses. The defendants further assert inclusion of the additional allegation is highly prejudicial. The court finds no defect in the indictment and recommends that the motion to strike be denied.

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

1. The defendants' motion to dismiss (Filing No. 255) be denied.
2. The defendants' motion to strike (Filing No. 261) be denied.

**ADMONITION**

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 21st day of June, 2005.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge